IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KOREEN W.,[1]

        Plaintiff,

      v.

ANDREW M. SAUL, Commissioner of Social
Security,

        Defendant.

Case No. 6:18-cv-02233-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

      Koreen W. ("Plaintiff") brings this appeal challenging the Commissioner of the Social

Security Administration's ("Commissioner") denial of her application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act. The Court has jurisdiction to hear

Plaintiff's appeal pursuant to 42 U.S.C. § 405(g). For the reasons explained below, the Court

reverses the Commissioner's decision and remands Plaintiff's case for an award of benefits.

///

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

**STANDARD OF REVIEW**

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either the grant or denial of Social Security benefits, the district court "'may not substitute [its] judgment for the [Commissioner's].'" *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

**BACKGROUND**

**I.      PLAINTIFF'S APPLICATION**

Plaintiff was born in August 1967, making her forty-eight years old on September 24, 2015, the alleged disability onset date. (Tr. 14, 23.) Plaintiff is a high school graduate and has past relevant work experience as a patch setter and hand bander. (Tr. 22-23, 32, 56.) In her DIB

application, Plaintiff alleged disability due to diabetes, "severe" neuropathy, and depression.[2] (Tr. 61, 72.)

The Commissioner denied Plaintiff's application initially and upon reconsideration, and on April 27, 2016, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 14.) Plaintiff and a vocational expert ("VE") appeared and testified at a hearing held on January 25, 2018. (Tr. 30-59.) On April 4, 2018, the ALJ issued a written decision denying Plaintiff's DIB application. (Tr. 14-24.) On October 25, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner. (Tr. 1-6.) Plaintiff now seeks judicial review of the ALJ's decision. (Compl. ¶¶ 1-5.)

## II. THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social

---

[2] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07-cv-01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Workers accumulate quarters of coverage based on their earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured of December 31, 2020 (*see* Tr. 14) reflects the date on which her insured status terminated based on the prior accumulation of quarters of coverage. If Plaintiff established that she was disabled on or before December 31, 2020, she is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15-cv-02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the sequential analysis, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 14-24.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since September 24, 2015, the alleged disability onset date. (Tr. 16.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "Diabetes mellitus with neuropathy, bilateral knee osteoarthritis and asthma." (Tr. 16.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or equals a listed impairment. (Tr. 17.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to these limitations: (1) Plaintiff can lift and carry twenty

pounds occasionally and ten pounds frequently, (2) Plaintiff can stand and walk for a total of four hours during an eight-hour workday, (3) Plaintiff can sit for a total of six hours during an eight-hour workday, (4) Plaintiff can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, (5) Plaintiff can frequently balance, (6) Plaintiff cannot climb ladders, ropes, or scaffolds, (7) Plaintiff must avoid "concentrated exposure to fumes, odors, dusts, gases and poorly ventilated areas," (8) Plaintiff must avoid "even moderate exposure to workplace hazards," (9) Plaintiff needs to be limited to "no more than occasional bilateral feeling," and (10) Plaintiff needs to be limited to "no more than occasional bilateral foot control operation." (Tr. 18.) At step four, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a patch setter and hand bander. (Tr. 22.) At step five, the ALJ concluded that Plaintiff was not disabled because a significant number of jobs existed in the national economy that she could perform, including work as a laundry sorter, gate guard, and inspector and hand packager. (Tr. 23-24.)

## DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by failing to provide: (1) specific, clear, and convincing reasons for discounting her testimony; and (2) germane reasons for discounting the opinion of her treating physician's assistant, Jon Gambill ("Gambill"). (Pl.'s Opening Br. at 5-6.) As explained below, the Court concludes that the Commissioner's decision is based on harmful legal error and not supported by substantial evidence. The Court further concludes that Plaintiff satisfies the credit-as-true standard, and the Court does not have serious doubt about whether Plaintiff is disabled. Accordingly, the Court remands Plaintiff's case for an award of benefits.

///

///

## I.     PLAINTIFF'S SYMPTOM TESTIMONY

### A.     Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

### B.     Analysis

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has provided objective medical evidence of underlying impairments which might reasonably produce

the symptoms alleged. (*See* Tr. 19, reflecting that the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"). The ALJ was therefore required to provide specific, clear, and convincing reasons for discrediting Plaintiff's symptom testimony. *See Ghanim*, 763 F.3d at 1163. The ALJ failed to meet that standard here.

### 1.    Reported Activities

The ALJ discounted Plaintiff's symptom testimony on the ground that it is inconsistent with her reported activities. (Tr. 22.) In support of this finding, the ALJ noted that Plaintiff reported that she "did her own activities of daily living," she drove, she "took care of her two dogs and a cat," and she "has guardianship of her grandson," which the ALJ found "[m]ost significant[]." (Tr. 22.) The ALJ in turn concluded that Plaintiff's "activities of daily living are inconsistent with the presence of persistently debilitating symptoms," noting that (1) "[u]nless appropriately fitted, driving requires the use of both the lower extremities and the use of hands," and (2) "[c]aring for animals and serving as guardian for a child are tasks that are demanding." (Tr. 22.)

"Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim*, 763 F.3d at 1165. Here, substantial evidence does not support the ALJ's finding that Plaintiff's level of activity is inconsistent with her claimed limitations. *See Garrison*, 759 F.3d at 1016 ("Recognizing that 'disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations,' we have held that '[o]nly if [the claimant's] level of activity [is] inconsistent with [the claimant's] claimed limitations would these activities have any bearing on [her] credibility.'") (citation omitted).

As an initial matter, the ALJ found it "[m]ost significant[]" that Plaintiff reported that she "has guardianship of her grandson." (Tr. 22.) It is true that Plaintiff's treatment records include one reference to a report that Plaintiff "will be taking care of her grandson because she now has guardianship." (*See* Tr. 354, showing that Plaintiff made this report to Gambill on November 13, 2015). Although the ALJ referred to caring for a grandchild as a "demanding" task, the record provides no details as to what Plaintiff's childcare activities involved. In fact, the ALJ never confirmed that Plaintiff ever cared for her grandson. That is significant because Plaintiff filled out a function report (with her friend's assistance) on February 28, 2016 (i.e., several months after Gambill noted that Plaintiff "will be taking care of her grandson"), which states (1) Plaintiff "typically self-isolates" but will "go see her grandson" on "a good day," (2) Plaintiff does not engage in social activities, such as visiting her grandson, "every week," (3) Plaintiff does not "go anywhere on a regular basis," and (4) Plaintiff "rarely feels good enough to go out once a week to see her son/grandson." (Tr. 193, 197.) This record evidence shows that the ALJ's reliance on Plaintiff's childcare activities was misplaced. *Cf. Trevizo v. Berryhill*, 871 F.3d 664, 676-82 (9th Cir. 2017) (holding that the ALJ erred in discounting the claimant's testimony and treating physician's opinion based on the claimant's childcare activities and emphasizing that the record provided "almost no information" and "no details" about what those childcare activities involved).

In discounting Plaintiff's testimony, the ALJ also relied on the fact that Plaintiff drives and cares for animals. It is well settled that an ALJ errs when he disregards a claimant's limitations in performing her activities. *See Meuser v. Colvin*, 838 F.3d 905, 913 (7th Cir. 2016) (explaining that "'[a]n ALJ cannot disregard a claimant's limitations in performing' daily activities," and noting that the ALJ discounted the claimant's testimony based on the claimant's

ability to complete chores, but the "ALJ ignored evidence" that the claimant received help from family members and rarely left the house) (citation omitted); *Scrogham v. Colvin*, 765 F.3d 685, 698-99 (7th Cir. 2014) (explaining that an ALJ errs by "consider[ing] evidence about [a claimant's] activities selectively, ignoring evidence that contradicted her findings"); *Eckloff v. Berryhill*, No. 17-cv-01049, 2019 WL 2418987, at *5 (D. Nev. June 10, 2019) ("[T]he ALJ was not permitted to cherry-pick only the details from the function report that support a denial of benefits and conclude that her activity of daily living are fully intact.") (citation omitted). The ALJ here did just that. (*Cf.* Tr. 49, 191-92, 197, reflecting that Plaintiff testified that she lives with friends who "help" her care for her animals, she only drives "short distances" on "days she is feeling good," she "rarely feels good enough to go out once a week to see her son/grandson," and she "typically can barely function enough to get by from day to day"). Accordingly, the Court concludes that the ALJ erred in discounting Plaintiff's symptom testimony based on her ability to occasionally drive short distances and ability to care for animals with her friends' assistance.[3]

Finally, in discounting Plaintiff's testimony based on her reported activities, the ALJ relied on the fact that Gambill noted that Plaintiff "did her own activities of daily living[.]" (Tr. 22, citing Tr. 494). On September 2, 2016, Gambill did note that Plaintiff was "doing her own ADLs," but he also noted that Plaintiff was "currently disabled" because she continued to

---

[3] In discussing Plaintiff's ability to drive, the ALJ emphasized that "[u]nless appropriately fitted, driving requires the use of both the lower extremities and the use of hands." (Tr. 22.) That's true, but Plaintiff never testified that she cannot ever use her lower extremities and hands; rather, Plaintiff testified that her impairments greatly impair her ability to do so. (*See, e.g.*, Tr. 197, reflecting that Plaintiff testified that her impairments, such as diabetic neuropathy in her hands and lower extremities, have "forced [her] to rely on her friends [and] family for even basic needs"). Further, the record does not address whether Plaintiff's car is "fitted" with any assistive devices. Thus, it is evident that the ALJ's reliance on Plaintiff's ability to drive was misplaced.

suffer from "severe neuropathy" in her "lower extremity and hand." (Tr. 494.) Furthermore, Plaintiff's testimony makes clear that her "own ADLs" were extremely limited due to her diabetes and peripheral neuropathy. (*See* Tr. 190-92, showing that Plaintiff testified that her housework consists of doing her laundry and sweeping "small areas" on "a good day," she "cannot do yard work," her house and yardwork limitations are due to the pain and numbness in her hands, legs, and feet, and she has a hard time getting to and from the bathroom on "bad days"). Accordingly, the ALJ's reliance on Plaintiff's ability to perform her "own ADLs" was misplaced.

In summary, the ALJ erred in discounting Plaintiff's testimony based on her reported activities.

## 2. Effective Treatment

The ALJ also discounted Plaintiff's testimony on the ground that her allegedly debilitating impairments (diabetes, peripheral neuropathy, etc.) were controlled effectively with treatment during the relevant period. (*See* Tr. 20, reflecting that the ALJ stated that Plaintiff's testimony is "not entirely consistent with the medical evidence and other evidence in the record" and "not objectively supported," and then emphasized in "regard to [Plaintiff's] diabetes with neuropathy" that Plaintiff's "diabetes has been well controlled with medication during the relevant period"; *see also* Def.'s Br. at 2-3, arguing that the ALJ provided three legally sufficient reasons for discounting Plaintiff's testimony, and that the ALJ appropriately discounted Plaintiff's testimony on the ground that "treatment adequately controlled [her] allegedly disabling impairments").

It is well settled that an ALJ may discount a claimant's symptom testimony based on effective treatment. *See Bettis v. Colvin*, 649 F. App'x 390, 391 (9th Cir. 2016) (holding that the ALJ met the clear and convincing reasons standard, and stating that the ALJ appropriately

discounted the claimant's testimony on the ground that his "condition improved with treatment," because "'[i]mpairments that can be controlled effectively with [treatment] are not disabling'") (citation omitted). As explained below, substantial evidence does not support the ALJ's determination that Plaintiff's allegedly debilitating impairments were effectively controlled with treatment.

Plaintiff's primary diagnosis is peripheral neuropathy. (Tr. 60, 65, 77, 84, 288.) Plaintiff's ability to control her peripheral neuropathy is dependent upon her ability to control her diabetes. (*See* Tr. 462, 469, 474, reflecting that Gambill stated that Plaintiff "has neuropathy pain from uncontrolled diabetes"). The record shows that Plaintiff's diabetes and peripheral neuropathy were not effectively controlled. (*See* Tr. 256, noting that on October 2, 2015, Plaintiff continued to suffer from "ongoing elevated glucose and severe peripheral neuropathy," Plaintiff's exam was "positive for sensation loss through the entire exam," and Plaintiff was "having breakthrough pain that [was] quite significant"; Tr. 232, indicating that on November 13, 2015, Plaintiff reported that she continued to suffer from neuropathy pain, which made it "hard to exercise, walk, or do any kind of activities without being in a lot of pain"; Tr. 224, showing that on December 24, 2015, the consultative examiner, who reviewed Plaintiff's records, stated that Plaintiff's diagnoses included "sub-optimally controlled" diabetes; Tr. 252, reflecting that on May 10, 2016, Plaintiff reported that her pain medication was "not helping"; Tr. 244, noting that on May 18, 2016, Gambill stated that Plaintiff's symptoms have "gradually gotten worse over the years to the point where at this point she cannot functionally work and hold a job," and Plaintiff had "very little feeling at this time" in her lower extremities and a "severe burning pain" in her hand; Tr. 482, indicating that on February 22, 2017, Gambill stated that Plaintiff's recent blood sugar tests showed that her diabetes was "[u]ncontrolled," even

though she was "compliant in taking her medication"; Tr. 475, showing that on April 19, 2017, Gambill noted that Plaintiff's sugars were "uncontrolled," even though she was "testing sugars 3-4 times daily" and "abstain[ing] from bread and . . . sugars"; Tr. 446, noting that on July 14, 2017, Plaintiff's test results showed elevated Hemoglobin A1C levels and elevated fasting blood sugar levels; Tr. 462, 469, 474, reflecting that on June 9, August 4, and September 29, 2017, Gambill stated that Plaintiff "has neuropathy pain from uncontrolled diabetes"; Tr. 457, indicating that on November 22, 2017, Gambill stated that Plaintiff's diabetes and neuropathy were "[u]controlled at this time with recent A1C=9.2 with glucose=174"; Tr. 453, showing that on December 14, 2017, more than two years after Plaintiff alleged the onset of disability, Gambill referred to Plaintiff's "Type 2 [d]iabetes . . . [w]ith [d]iabetic neuropathy" as "[u]ncontrolled").

Given the evidence described above, the Court cannot conclude that substantial evidence supported the ALJ's decision to discount Plaintiff's testimony on the ground that "treatment adequately controlled [her] allegedly disability impairments" (Def.'s Br. at 2), because the record shows that Plaintiff's diabetes and peripheral neuropathy were not adequately controlled by treatment.

### 3. The Consultative Examiner's Opinion

Third, and finally, the Commissioner argues that the ALJ was "justified in relying on [the consultative examiner's opinion] to discount Plaintiff's allegations." (Def.'s Br. at 3, citing Tr. 20-21). The Commissioner further argues that the consultative examiner's opinion "'alone constitutes substantial evidence' supporting [the ALJ's symptom analysis] 'because it rests on [the examiner's] own independent examination of [the claimant].'" (Def.'s Br. at 3) (citation omitted).

In her decision, the ALJ stated that the "overall condition stability" reflected in Plaintiff's medical records "align[ed] with" the opinion of the consultative examiner, Derek Leinenbach, M.D. ("Dr. Leinenbach"), who examined Plaintiff on December 14, 2015.[4] (*See* Tr. 21, 222-25.) After assigning "great weight" to Dr. Leinenbach's opinion, the ALJ also stated that Plaintiff's "medical records does not contain *any* objective findings or treatment notes that would support [finding that Plaintiff] is much more limited than assessed by Dr. Leinenbach." (Tr. 21) (emphasis added).

Substantial evidence does not support the ALJ's findings. As described above, the record shows that Plaintiff's diabetes and peripheral neuropathy were not effectively controlled. In fact, even Dr. Leinenbach stated that Plaintiff's medical records showed that her diabetes was "sub-optimally controlled." (Tr. 224.) If Plaintiff's diabetes is uncontrolled, and if Plaintiff "has neuropathy pain from [her] uncontrolled diabetes" (Tr. 462, 469, 474), substantial evidence does not support the ALJ's finding that Plaintiff's medical records reflect "overall condition stability," nor that the records align with Dr. Leinenbach's opinion.

Further, substantial evidence does not support the ALJ's finding that Plaintiff's medical records do not contain "*any* objective findings or treatment notes that would support [finding that Plaintiff] is much more limited than assessed by Dr. Leinenbach." (Tr. 21) (emphasis added). There are numerous treatment notes and objective findings demonstrating that Plaintiff is much

---

[4] After examining Plaintiff and reviewing Plaintiff's medical records, Dr. Leinenbach opined that (1) Plaintiff can stand and walk for a total of four hours during an eight-hour workday, (2) Plaintiff can sit "without limitation," (3) Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently, (4) Plaintiff can engage in no more than occasional crouching and climbing, (5) Plaintiff "can reach, handle, and finger without limitation," (6) Plaintiff can engage in no more than occasional feeling, and (7) Plaintiff should not work "at unprotected heights" or "near dust, fumes, and gases." (Tr. 225.) In finding that Plaintiff was not disabled, the ALJ relied largely on Dr. Leinenbach's opinion. (*Compare* Tr. 18, 24, *with* Tr. 50-51, *and* Tr. 225).

more limited. (*See supra* Part I.B.2; Tr. 347, showing that on March 26, 2010, over five years before the alleged onset date, Plaintiff's nerve conduction studies showed "electrophysiologic evidence to suggest a lumbar radiculopathy," and "electrophysiologic evidence to suggest" the presence of "sensorimotor peripheral neuropathy"; Tr. 288, reflecting that on April 11, 2013, Plaintiff was suffering "severe burning leg pains from neuropathy for 3 years," which was "getting worse"; Tr. 316, indicating that on July 17, 2014, Gambill observed that Plaintiff was "walking with a limp that [was] quite noticeable," and Plaintiff was "warm to [the] touch" and exhibited decreased sensation; Tr. 238, noting that on March 4, 2015, Plaintiff, who had worked at the same job for nearly twenty-seven years, missed "work for a month" because of her "neuropathy symptoms"; Tr. 256, showing that on October 2, 2015, Gambill stated that Plaintiff continued to suffer from "ongoing elevated glucose and severe peripheral neuropathy," and that Plaintiff's examination was "positive for sensation loss through the entire exam"; Tr. 244, showing that on May 18, 2016, Gambill stated that Plaintiff's symptoms have "gradually gotten worse over the years to the point where at this point she cannot functionally work and hold a job"; Tr. 435, indicating that on February 13, 2017, Gambill referred Plaintiff, who recently had her "right 2nd [toe]nail . . . removed due to infection," to a podiatrist for a "diabetic foot check"; Tr. 482, noting that on February 22, 2017, Gambill stated that Plaintiff's recent blood sugar tests showed that her diabetes was "[u]ncontrolled," Tr. 433-37, showing that on March 20, 2017, Plaintiff's podiatrist needed to perform "a total nail avulsion to [Plaintiff's] right great toenail" because she had a "painful ingrown nail[]," and diagnosed Plaintiff with "Diabetes University of Texas foot risk category 1"; Tr. 446, reflecting that on July 14, 2017, Plaintiff's test results showed elevated Hemoglobin A1C levels and elevated fasting blood sugar levels; Tr. 457, noting that on November 22, 2017, Gambill stated that Plaintiff's diabetes and neuropathy were

uncontrolled "with recent A1C=9.2 with glucose=174"; Tr. 516-20, reflecting that on December 14, 2017, Gambill opined that Plaintiff suffers from limitations that the VE testified would preclude gainful activity, and cited Plaintiff's A1C levels and "sensory neural reduction in mono[filament] testing").

In sum, the ALJ erred to the extent that she discounted Plaintiff's testimony based on Dr. Leinenbach's opinion.[5]

### 4. Conclusion

The Commissioner argues that the ALJ appropriately discounted Plaintiff's testimony based on (1) her reported activities, (2) the fact that her allegedly debilitating impairments were controlled effectively with treatment, and (3) Dr. Leinenbach's opinion. (Def.'s Br. at 2-3.) None of these reasons are supported by substantial evidence. Accordingly, the Court concludes that the ALJ failed to provide clear and convincing reasons for discounting Plaintiff's symptom testimony.

## II. GAMBILL'S OPINION

Plaintiff argues that the ALJ failed to provide legally sufficient reasons for rejecting the opinion of her physician's assistant, Gambill. "Only physicians and certain other qualified specialists are considered '[a]cceptable medical sources.'" *Ghanim*, 763 F.3d at 1161 (quoting *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)). Physician's assistants are considered

---

[5] Aside from Gambill and Dr. Leinenbach, the only other medical sources who assessed the severity of Plaintiff's diabetic neuropathy were the non-examining state agency physicians. Unlike Dr. Leinenbach's opinion, the ALJ discounted the state agency physicians' opinions because she determined that they did not "adequately account" for Plaintiff's "diabetic neuropathy affecting the hands and feet." (Tr. 21.) In other words, the ALJ found that the non-examining state agency physicians' opinions were not restrictive enough. Notably, however, the non-examining state agency physicians' opinions account for most of the limitations that Dr. Leinenbach identified and are more restrictive in several ways. (*Compare* Tr. 66-68, 79-81, *with* Tr. 224.)

"other sources," not acceptable medical sources. *Ruiz v. Colvin*, 638 F. App'x 604, 606 (9th Cir. 2016) (citing *Molina*, 674 F.3d at 1110). "Opinion evidence from treating physician's assistants may be discredited so long as the ALJ provides germane reasons for doing so." *Id.* (citation omitted).

On December 14, 2017, Gambill completed a Medical Evaluation form. (Tr. 516-20.) Gambill explained that Plaintiff has been treated on a monthly basis at his clinic for several decades, Plaintiff's diagnoses are diabetes and peripheral neuropathy, Plaintiff's symptoms include a burning sensation deep in her legs, feet, and toes, and his clinical findings include elevated A1C levels and "sensory neural reduction in mono[filament] testing." (Tr. 516-17.) Gambill also opined that Plaintiff needs to lie down "periodically during the day," Plaintiff can stand and walk less than one hour during an eight-hour workday, Plaintiff would need unscheduled work breaks every thirty minutes, Plaintiff would need to elevate her legs for three to six hours "in a physical 8-hour period," and Plaintiff's "medical problems [would] prevent her from being able to maintain a regular work schedule . . . [at least] 4 days per month." (Tr. 517-20.)

The ALJ assigned "little weight" to Gambill's opinion because she found that it did "not align with his observations." (Tr. 21.) In the paragraph addressing Gambill's opinion, the ALJ added that (1) "while it may be true that [Plaintiff] had difficulties sustaining her last job [after nearly twenty-seven years], it was also much heavier work [at a mill]," and (2) "I am persuaded that [Plaintiff] would be able to sustain work within the limits articulated in the [RFC], which is light work and which contains provisions accommodating [Plaintiff's] physical impairments." (Tr. 21.)

The Commissioner does not assert that the ALJ's commentary about Plaintiff's difficulties sustaining her past work and the ALJ's belief that Plaintiff can perform a modified version of light work were germane reasons for rejecting Gambill's opinion. (*See* Def.'s Br. at 4.) Instead, the Commissioner argues that the ALJ appropriately discounted Gambill's opinion on the ground it did not align with his observations. (Def.'s Br. at 4.) The Commissioner also notes that Plaintiff's treatment was "generally effective at treating Plaintiff's impairments," and that Dr. Leinenbach's opinion "constitutes substantial evidence supporting the ALJ's reasoning." (Def.'s Br. at 4.)

The Court is not persuaded by the Commissioner's arguments. In finding that Gambill's opinion did not align with "his own observations" (the majority of which are detailed above, *see supra* Part I.B.2-3), the ALJ cited only one of Gambill's treatment notes. (*See* Tr. 457, reflecting that on November 22, 2017, Gambill stated that Plaintiff was able to "reduce daily pain and perform daily activities with current medication"). Plaintiff's podiatrist, not Gambill, issued the other treatment note that the ALJ cited in support of her finding that Gambill's opinion does not align with his own observations. (*See* Tr. 435-37, showing that on February 13, 2017, Plaintiff presented for a diabetic foot check and exhibited full muscle strength on examination). When these two records are compared to the records described in Part I.B.2-3, it is evident that Gambill's opinion aligns with his own observations and that the ALJ cherry-picked records to discount his opinion. Accordingly, the ALJ erred in discounting Gambill's opinion. *See Holohan, 246 F.3d at 1201* (stating that the court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence'") (citation omitted); *Kovach v. Berryhill, No. 18-1848, 2019 WL 4745036, at *8 (S.D. Cal. Sept. 30, 2019)* (explaining that an "ALJ

cannot cherry-pick portions of the record to support a conflict with the treating physician's opinion").

In conclusion, the ALJ failed to provide germane reasons for discounting Gambill's opinion.

## III.   REMEDY

### A.   Applicable Law

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). In a number of cases, however, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [the three-part credit-as-true standard is] met." *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014) (citations omitted).

The credit-as-true standard is met if three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020 (citations omitted). Even when the credit-as-true standard is met, the court retains the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

///

///

### B.     Analysis

The Court finds that the credit-as-true standard is satisfied here and that remand for an award of benefits is warranted.

First, the Court finds that the record has been fully developed. It includes over seven years' worth of treatment notes, testimony from Plaintiff about her symptoms and limitations, and an opinion from Plaintiff's long-time treating provider, Gambill. The ALJ and Plaintiff's counsel asked the VE hypothetical questions that addressed whether a worker with Plaintiff's limitations could sustain gainful employment, and the VE testified that Plaintiff's limitations would preclude work. (*See* Tr. 52, "If a person was going to miss work four or more times per month on average [on an] ongoing basis what impact would that have on the unskilled occupational base [that you identified as suitable for Plaintiff]? A. Well again, based on my vocational experience . . . that would rule out competitive employment because it would be beyond what employers would accept. One day per month on an ongoing basis is what I've identified in working with employers."; *cf.* Tr. 520, showing that Gambill opined that Plaintiff's "medical problems [would] prevent her from being able to maintain a regular work schedule . . . [at least] 4 days per month"; Tr. 33-34, 40-41, reflecting that Plaintiff testified that she was fired after nearly twenty-seven years because she was missing too much work due to her neuropathy symptoms, and that her feet would swell up so bad that she occasionally "couldn't even get [her work] boots on"; Tr. 197, stating that Plaintiff "typically can barely function enough to get by from day to day").

As to further proceedings, the Commissioner does not explain how further proceeding would serve a useful purpose here. (*See* Def.'s Br. at 5, arguing only that a remand for benefits is inappropriate because "Plaintiff cannot establish the rare circumstances necessary for a deviation from the ordinary remand rule"). In this Court's view, Ninth Circuit precedent and the objectives

of the credit-as-true standard foreclose any suggestion that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a "useful purpose":

> Although the Commissioner argues that further proceedings would serve the 'useful purpose' of allowing the ALJ to revisit the medical opinions and testimony that she rejected for legally insufficient reasons, our precedent and the objectives of the credit-as-true rule foreclose the argument that a remand for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of credit-as-true analysis.

*Garrison*, 759 F.3d at 1021; *see also Benecke*, 379 F.3d at 595 ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication."); *Moisa v. Barnhart*, 367 F.3d 882, 887 (9th Cir. 2004) ("The Commissioner, having lost this appeal, should not have another opportunity to show that [the claimant] is not credible any more than [the claimant], had he lost, should have an opportunity for remand and further proceedings to establish his credibility."). Accordingly, the Court finds that Plaintiff meets the first part of the credit-as-true analysis.

Second, as discussed above, the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's testimony and Gambill's opinion. Accordingly, the Court finds that Plaintiff satisfies the second part of the credit-as-true analysis.

Third, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled because her impairments would cause her to exceed the customary tolerance for absences.

For these reasons, and because the Court does not have serious doubt about whether Plaintiff is disabled, the Court exercises its discretion to remand this case for an award of benefits.

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and

REMANDS for an award of benefits.

**IT IS SO ORDERED.**

DATED this 6th day of April, 2020.

_____
STACIE F. BECKERMAN
United States Magistrate Judge